## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

WOODSIDE ENERGY (AMERICAS) INC. )
F/K/A BHP BILLITON PETROLEUM )
(AMERICAS) INC. )
                )
       *Plaintiff*, )
                )
v. )       Civil Action No. 6:25-cv-00077
                )
THE UNITED STATES DEPARTMENT )
OF THE INTERIOR, )
                )
       *Defendant*. )
_____ )

## ORIGINAL COMPLAINT

Woodside Energy (Americas) Inc. f/k/a BHP Billiton Petroleum (Americas) Inc. ("**Woodside**") files this Original Complaint against Defendant U.S. Department of the Interior (the "**Department**"). Woodside respectfully shows the following.

## PRELIMINARY STATEMENT

1.    Woodside has timely appealed orders issued by the Office of Natural Resources Revenue ("**ONRR**"): (i) a December 7, 2020 order to perform restructured accounting (the "**Order**"), (ii) a denial of ten 2017 requests to exceed regulatory allowance limitation; and (iii) a denial of a 2017 refund request (the "**Refund Request**") (ONRR's denial of each, a "**Denial**"). Woodside appealed each Denial separately to the ONRR Director ("**Director**").

2.    On June 7, 2023, the Director consolidated the Denial appeals and affirmed them in a single decision (the "**Decision**"). Despite the consolidation, each appeal retains its own 33-month administrative deadline under the Federal Oil and Gas Royalty Management Act ("**FOGRMA**"), as amended.

3.      Under FOGRMA, "[d]emands or orders issued by the Secretary" of the Department are subject to administrative appeal. 30 U.S.C. § 1724(h)(1). If a demand or order is appealed, the Secretary "shall issue a final decision in any administrative proceeding . . . within 33 months from the date such proceeding was commenced." *Id.* The 33-month deadline may be extended by a written agreement between the Secretary and appellant. *Id.* If the Secretary does not issue a final decision within the 33-month period, the Secretary is "deemed" to issue a final decision "affirm[ing] those issues for which the agency rendered a decision prior to the end of such period." *Id.* § 1724(h)(2).

4.      Under 30 U.S.C. § 1724(j), a lessee must commence a judicial proceeding challenging final agency action "within 180 days from receipt of notice by the lessee . . . of the final agency action." Woodside and ONRR disagree over the applicable dates under § 1724(h) and (j).

## INTRODUCTION

5.      From February 2011 through July 2017, Woodside produced oil and gas from wells located on federal offshore leases in the Gulf of Mexico. As a result, Woodside incurred substantial capital and operating expenses for pipelines and related equipment and services to move the oil and gas off its leases for sale or delivery.

6.      The Department's regulations distinguish between two kinds of movement of oil and gas: "gathering" and "transportation." "Gathering" means moving oil or gas "to a central accumulation or treatment point on the lease . . . or to a central accumulation or treatment point off the lease . . . that BLM or BSEE approves for onshore and offshore leases, respectively." "Transportation" means "moving oil [or gas] to a point of sale or delivery off the lease." The distinction matters because "gathering" costs are not deductible from royalty payments (as "allowances"), but "transportation" costs are.

2

7.      Accordingly, Woodside properly deducted from its royalty payments the equipment and operating costs it incurred to move oil and gas off its leases as "transportation" costs. To that end, Woodside's agent requested a refund from the Department to recoup overpayments on past royalties.

8.      Driven by a bad-faith desire to increase revenue, ONRR denied Woodside's refund request and issued the Decision and Order, arguing that Woodside's transportation deductions were improper.

9.      The principal issue in this case is whether the costs Woodside incurred to transport oil and gas from their platforms in the Gulf of Mexico to onshore points of sale or delivery are deductible "transportation" costs under the Department's regulations.

10.      Woodside brings this action against the Department under the Administrative Procedure Act ("**APA**"), 5 U.S.C. §§ 701–06; FOGRMA, 30 U.S.C. §§ 1701–59, as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 ("**RSFA**"), Pub. L. No. 104-185, 110 Stat. 1700; the Outer Continental Shelf Lands Act of 1953 ("**OCSLA**"), as amended, 43 U.S.C. §§ 1331, *et seq.*; the federal royalty regulations, 30 C.F.R. Chapter XII, Parts 1200–99 (2007–2010); and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

11.      Through this action, Woodside respectfully seeks review of the Department's Decision and Order.

12.      Under *Murphy Exploration and Production Company v. U.S. Department of the Interior*, the Secretary of the Interior ("**Secretary**") was deemed to issue a final decision affirming ONRR's denial of the Refund Request under 30 U.S.C. § 1724(h)(2) on March 20, 2024. 252 F.3d 473, 480–82 (D.C. Cir. 2001).

13.     Also under *Murphy*, the Secretary was deemed to issue a final decision affirming ONRR's Order on July 22, 2024. *Id.*

14.     Through this action, and pursuant to the APA, 5 U.S.C. § 706(2)(A)–(F), Woodside respectfully requests the Decision and Order be declared unlawful and vacated.

## JURISDICTION AND VENUE

15.     Neither the Order nor the Decision is subject to further appeal within the Department. Thus, they constitute final agency action. *See Continental Res., Inc. v. Jewell*, 846 F.3d 1232, 1233–34 (D.C. Cir. 2017).

16.     Woodside has suffered legal wrong from, and is adversely affected by, the Decision and Order under 5 U.S.C. § 702.

17.     This action arises under the APA; the FOGRMA, as amended by the RSFA; the OCSLA, as amended; the federal royalty regulations; and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

18.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201–02 (declaratory relief), and 43 U.S.C. § 1349(b)(1) (actions arising out of production of minerals on the Outer Continental Shelf ("**OCS**")).

19.     An actual controversy exists between the parties under the Declaratory Judgment Act. By operation of the APA, Congress has waived the sovereign's immunity from suit.

20.     Venue is proper because the Department may be found in this district. 43 U.S.C. § 1349(b); *see also Superior Oil Co. v. Andrus*, 656 F.2d 33, 41 (3d Cir. 1981) (holding that agencies administering OCSLA can be sued in Delaware because the government "may be found" there). Venue is also proper because the properties from which the cause of action arose are offshore of this district.

## PARTIES AND PROPERTIES

21.    Woodside is a Delaware corporation with its principal place of business in Houston, Texas.

22.    Woodside holds the following OCS leases in the Gulf of Mexico relevant to this litigation: 0540080350, 0540080360, 0540080380, 0540099820, 0540156040, 0540156060, 0540156070, 0540156080, 0540156090, 0540156100, and 0540200840 (collectively, the "**Leases**").

23.    The Department is a federal executive department of the U.S. government.

## THE AGENCY DECISIONS UNDER REVIEW

24.    In the Decision, the Department relies exclusively on the Order to deny Woodside's Refund Request and requests to exceed. In doing so, the Decision and Order distinguish "gathering" costs, which are not deductible, from "transportation" costs, which are deductible.

25.    "Gathering" means moving oil or gas "to a central accumulation or treatment point on the lease . . . or to a central accumulation or treatment point off the lease . . . that BLM or BSEE approves for onshore and offshore leases, respectively."[1]

26.    "Transportation" means "moving oil [or gas] to a point of sale or delivery off the lease."[2]

---

[1] 30 C.F.R. § 1206.101 (federal oil) (2016); *id.* § 1206.151 (federal gas) (2016) (defining gathering as "movement of lease production to a central accumulation and/or treatment point on the lease . . . or to a central accumulation or treatment point off the lease . . . as approved by BLM or BSEE OCS operations personnel for onshore and OCS leases, respectively"). Woodside's Refund Request relates to oil and gas sold between February 2011 and July 2017. The product-valuation regulations were revised twice during that period, but the definitions of "gathering" and "transportation" remained nearly identical. Accordingly, Woodside cites to the regulations in effect during 2016 throughout this Complaint.

[2] 30 C.F.R. § 1206.101 (federal oil) (2016); *id.* § 1206.151 (federal gas) (2016) (defining transportation as "moving unprocessed gas, residue gas, or gas plant products to a point of sale or delivery off the lease").

27.    Contrary to six decades of Department practice and precedent, the Decision and Order create a new bright-line rule that lessees may never claim transportation allowances for costs incurred before production reaches the royalty measurement point (the "**RMP**").

28.    The Secretary is deemed to have finally affirmed the Decision and Order under 30 U.S.C. § 1724(h). The "Secretary" is defined by the same statute to mean "the Secretary of the Interior *or his designee*." *Id.* § 1702(15) (emphasis added). The Secretary has, by regulation, designated the Interior Board of Land Appeals (the "**IBLA**" or "**Board**") as having the authority to issue final decisions in appeals concerning payments of oil and gas royalties.

29.    The Decision and Order must be reversed for the following reasons.

## COUNT I
### THE DEPARTMENT'S DECISION AND ORDER
### WERE THE PRODUCT OF BIAS AND PREJUDGMENT

30.    Woodside repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

31.    Since at least 2017, ONRR has shown bias by pursuing a campaign of denying transportation allowances for independent operators in the Gulf of Mexico and issuing orders for those operators to perform restructured accounting for their royalty valuations. The Order that the Department relied on to justify its Decision here is one such order.

32.    FOGRMA requires that an order to perform restructured accounting—such as the Order involved here—be based on an "audit." 30 U.S.C. § 1724(d)(4)(B)(i); *Hess Corp.*, 197 IBLA 299, 327 (2021).

33.    The Department's regulations define "audit" to be "an examination, conducted under" Generally Accepted Government Auditing Standards ("**GAGAS**")." 30 C.F.R. § 1206.20 (2023); *Hess Corp.*, 197 IBLA at 325–26.

34.    A pillar of GAGAS is that governmental auditors follow certain ethical principles, chiefly objectivity and independence. U.S. GOV'T ACCOUNTABILITY OFF., GAGAS Ch. 3 (2018). These principles demand that auditors be free from preconceptions about the subject of their work. *Id.* § 3.40(a). Thus, an audit report, GAGAS instructs, is more objective when performed by unbiased personnel. *Id.* § 9.17(b).

35.    An audit that is not objective is not GAGAS-compliant. *Id.* §§ 3.40(a), 9.17(b). Therefore, an examination that is not objective is not an "audit" under the Department's regulations.

36.    ONRR's audit of Woodside's royalty reporting and payment violated GAGAS because the review was tainted by ONRR's revenue-based preconceptions against any and all "transportation allowance" claims. Thus, the Decision and Order violate FOGRMA. 30 U.S.C. § 1724(d)(4)(B)(i). Accordingly, the Decision and Order must be set aside under the APA as "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

37.    Even where there is no violation of FOGRMA or GAGAS, if an agency decision "rested on a pretextual basis," it must be set aside. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) (finding agency decision to reinstate the citizenship question in census questionnaire was based on pretext where Secretary "was determined to reinstate" the question "from the time he entered office" for reasons unrelated to the Voting Rights Act, but under the pretext of VRA concerns).

38.    A trove of internal ONRR emails reveals that ONRR personnel harbored pervasive bias and preconceptions against transportation allowances and refund claims even though the Department's regulations expressly provide for them. These emails were based on nothing more

than the desire for additional royalty revenues.

39.    Beyond these compromising emails, ONRR's actions during the audit exemplify its prejudgment against Woodside. For instance, ONRR had just a few years earlier audited and *approved* Woodside's transportation costs and calculations before it began the audit at issue here.

40.    Woodside requested documents from this prior audit to determine why ONRR's position regarding costs incurred in connection with the same locations had suddenly changed.

41.    In response, ONRR made demonstrably and knowingly false statements about losing the prior audit documents in Hurricane Harvey. Woodside's agent was forced to determine whether this was true. ONRR eventually admitted to its prevarication but would not explain why it refused to turn over the prior audit documents. In fact, Woodside was forced to obtain the prior audit documents through a Freedom of Information Act request and did not receive those documents until three years after it had asked ONRR for them.

42.    Accordingly, the IBLA issued an order holding ONRR's "failure to include the prior audits and analyses in the record *suggested bad faith* or carelessness in compiling the record." (Emphasis added).

43.    Despite possessing the prior audit documents, ONRR insisted that Woodside resubmit its transportation allowance calculations with substantially different information than was previously deemed acceptable. At substantial time and cost, Woodside complied and submitted these recalculations and supporting documents to ONRR on October 14, 2020, and walked ONRR through the calculations.

44.    But when Woodside submitted its recalculations and supporting documents, ONRR ignored them and proceeded to issue the Order, which outright admits that "[t]he issues in this Order are based on the documentation received prior to October 14, 2020."

8

45.     "If judicial review is to be more than an empty ritual, it must demand something better than" a pretextual explanation for a decision. *Dep't of Com.*, 139 S. Ct. at 2576; *see also Louisiana v. Becerra*, No. 3:21-CV-04370, 2022 WL 1716243, at *3 (W.D. La. May 16, 2022) (citations omitted) ("Meaningful judicial review requires an agency to disclose the basis of its action. It does not permit an agency to obscure the actual bases for its conduct. Agencies must offer genuine justifications, including 'unwritten justifications.'").

46.     The evidence is clear: ONRR did not audit Woodside objectively. "Objectivity includes *independence of mind* and appearance when providing audits, maintaining an attitude of *impartiality*, having *intellectual honesty*, and being *free of conflicts of interest*." GAGAS, § 1.19 (emphasis added).

47.     Here, ONRR has demonstrated predetermination through the biased actions taken by its personnel involved. For example, the incriminating emails from ONRR employees prove ONRR facilitated a pattern and practice of unfairly denying refund requests starting around the time ONRR began auditing Woodside. Moreover, ONRR's interactions with Woodside—making false statements regarding prior audit documents and ignoring Woodside's recalculations—show that ONRR acted in bad faith to deny Woodside's Refund Request. This bias alone is sufficient to vacate the Decision and Order. *Dep't of Com.*, 139 S. Ct. at 2576; *Becerra*, 2022 WL 1716243, at *3. However, its bias also amounted to violations of GAGAS and FOGRMA, and, thus, makes the Decision and Order "unlawful" under the APA. 5 U.S.C. §§ 706(2)(A), (D).

48.     The Decision and Order are arbitrary because they are a product of agency bias.

## COUNT II
## THE DEPARTMENT DEFENDED THE ADMINISTRATIVE APPEALS IN BAD FAITH

49.     Woodside repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

50.    "[P]roof of subjective bad faith by procuring officials . . . generally constitutes arbitrary and capricious action." *Latecoere Intern., Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994).

51.    There is an exception to the "general rule against inquiring into the mental processes of administrative decisionmakers" where there is a "strong showing of bad faith or behavior." *Id.*; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Where there is a prima facie showing that there is "material in the agency's possession indicative of bad faith," courts must look beyond the administrative record the agency chose to present. *Becerra*, 2022 WL 1716243, at *3.

52.    In addition to ONRR's bad faith in issuing the Decision and Order, ONRR exhibited bad faith by failing to "disclose the basis of its action" and "obscur[ing] the actual bases for its conduct" in its defense of these appeals. *Becerra*, 2022 WL 1716243, at *3.

53.    ONRR withheld substantial, material documentation and information from the administrative record since the beginning of the administrative appeals. Woodside had to spend substantial resources identifying what should be in the records but is not.

54.    On July 8, 2021, ONRR submitted the original record. Woodside immediately identified deficiencies. Woodside conferred with ONRR, and ONRR supplemented the record with twenty additional documents and provided a privilege log on July 23, 2021. The privilege log, however, did not identify all documents ONRR had redacted or withheld from the record.

55.    The record contained heavy redactions and many documents that were withheld based on privilege. Thus, Woodside filed its Motion for *In Camera* Review on August 31, 2021 ("**Motion**"), so the IBLA could review a random selection of documents and determine if ONRR properly withheld them.

56.     On August 22, 2023, the IBLA granted Woodside's Motion and ordered ONRR to provide the IBLA "with the 269 disputed documents for *in camera* review no later than September 8, 2023," because ONRR's failure in compiling the record "suggested bad faith and carelessness." The IBLA ordered that "[a]ny assertion that a document was not directly or indirectly considered by the decisionmaker or the staff who advised the decisionmaker, or that a document is protected by the deliberative process privilege, must be made by an agency official under oath."

57.     But even after the Board ordered ONRR to produce the disputed documents for review and attest to why ONRR withheld them from the record, ONRR Director Howard Cantor submitted an affidavit doubling down on ONRR's erroneous privilege claims.

58.     Woodside also confirmed that ONRR withheld documents from the record on overbroad assertions of the deliberative process privilege. But the "privileged" documents reflected meetings with Woodside's agent or were otherwise not "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)); *see also Skelton v. U.S. Postal Serv.*, 678 F.2d 35, 38 (5th Cir. 1982) ("The privilege protects predecisional materials 'reflecting deliberative or policy-making processes,' but not materials that are 'purely factual.'").

59.     Though the documents ONRR withheld from the record are not deliberative, even if they were, privileged documents are discoverable if there is a showing of bad faith or improper behavior. *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019).

60.     Where there is a strong showing of bad faith, "it may be that the only way there can be an effective judicial review is by examining the decisionmakers themselves." *Citizens to Pres. Overton Park*, 401 U.S. at 420.

61.     ONRR's bad faith actions—refusing to turn over the full administrative record for the IBLA's and this Court's review, making demonstrably false assertions of privilege regarding the administrative record, and continuing to defend the false assertions to this day—call into question the propriety of ONRR's Decision and Order.

62.     Thus, the Decision and Order should be set aside for being issued unlawfully and without procedure required by law. 5 U.S.C. § 706(2); *Latecoere Intern., Inc.*, 19 F.3d at 1356.

## COUNT III
## THE DECISION AND ORDER VIOLATE THE OCSLA AND APA BECAUSE THEY DO NOT EXPLAIN ONRR'S DEPARTURE FROM LONGSTANDING PRECEDENT

63.     Woodside repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

64.     Since the 1960s, the Department agreed that "transportation" from OCS leases began on the offshore platforms, meaning costs incurred to move production ashore were deductible. In a surprise reversal of Department precedent, the Decision and Order now conclude that "transportation" does not begin until production reaches the RMP, even if that point is onshore, and even if the production is conveyed *hundreds* of miles from the offshore platform to that point.

65.     The Decision and Order cite no precedent disallowing all costs of moving production to the RMP. The position is inconsistent with numerous precedents going back 60 years.

66.     The Decision and Order fail to acknowledge these precedents, much less explain ONRR's departure from the Department's longstanding interpretation of the regulations. They are

therefore arbitrary. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220–23 (2016).

## COUNT IV

### THE DECISION AND ORDER VIOLATE THE OCSLA AND APA BECAUSE
### THEY TREAT WOODSIDE DIFFERENTLY THAN SIMILARLY SITUATED PAYORS

67.    Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

68.    The Department has consistently approved similarly situated payors' platform transportation allowances through appeals, audits, and guidance.

69.    In the absence of any explanation, it is arbitrary and capricious for the Department to treat Woodside differently than similarly situated payors in valuing production for royalty purposes. *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).

## COUNT V

### THE DECISION AND ORDER VIOLATE
### THE DUE PROCESS CLAUSE AND THE APA

70.    Woodside repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

71.    The Decision and Order violate Woodside's rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution because ONRR failed to provide fair notice of its new, counter-textual interpretation of its regulations.

72.    The Decision and Order also violate Woodside's rights under the Due Process Clause of the Fifth Amendment because Defendant denied Woodside timely access to the very information necessary to understand the final decisions.  *See Amoco v. Fry*, 118 F.3d 812, 829 (D.C. Cir. 1997).

73.    The Decision and Order violate Woodside's rights under the APA because ONRR's interpretation amounts to a large, likely multi-billion-dollar negative impact to producers.

## COUNT VI

### THE DECISION AND ORDER VIOLATE THE APA AND FOGRMA BECAUSE THEY DO NOT MEET STATUTORY REQUIREMENTS

74.     Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

75.     The Decision and Order do not meet the statutory requirements for obligation identification, specificity, or reasoning, as required under 30 U.S.C. §§ 1702(23), 1702(26), and 1724(b)(1).

76.     Moreover, the Decision and Order are unlawful under 30 U.S.C. §§ 1724(b)(1), 1702(23), 1702(25), and 1702(26) because they fail to (1) respond to Woodside's views and (2) explain why ONRR or the Director chose to abandon the Department's longstanding interpretation of "gathering."

77.     By failing to observe procedure required by law, the Decision and Order must be held unlawful and set aside.  5 U.S.C. § 706(2)(D).

## COUNT VII

### THE DECISION AND ORDER VIOLATE THE APA AND FOGRMA BECAUSE THEY DO NOT ADDRESS FACTS IN THE RECORD

78.     Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

79.     On multiple other issues, the Decision and Order arbitrarily fail to address facts in the record and alter the requirements of existing regulations by unlawful *ad hoc* interpretations, including willfully ignoring supplemented, probative documents submitted prior to the Director's Decision or ONRR's Order.

80.     The Decision and Order were also based on bad faith and bias, as will be evident when the full administrative record is presented to the Court.

14

**COUNT VIII**

**IN CLASSIFYING WOODSIDE'S TRANSPORTATION AS "GATHERING,"**
**THE DECISION AND ORDER VIOLATED THE DEPARTMENT'S REGULATIONS**

81.    Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

82.    When paying royalties, the Department's regulations generally permit lessees to deduct costs incurred for "moving oil [or gas] to a point of sale or delivery off the lease." There are only two caveats: lessees may not deduct costs incurred moving oil and gas "to a central accumulation or treatment point on [or off] the lease," and lessees may not deduct costs incurred to put the production into "marketable condition."

83.    The Decision and Order, however, create a new caveat out of thin air: they argue that lessees also cannot deduct costs incurred to move oil and gas to the RMP. Importantly, "central accumulation point" and "central treatment point" are entirely separate from the RMP. Indeed, the royalty-valuation regulations do not mention RMP anywhere.

84.    On top of conflicting with the regulation's plain meaning, the Decision and Order also contradict the history and structure of the regulations.

85.    But despite common sense and longstanding precedent, the Decision and Order imposed their new rule and rejected Woodside's Refund Request and transportation accounting. Thus, the Decision and Order are arbitrary because they misinterpret and misapply the Department's published regulations.

**COUNT IX**

**IN CLASSIFYING WOODSIDE'S TRANSPORTATION AS "GATHERING,"**
**THE DEPARTMENT UNLAWFULLY DISREGARDED WOODSIDE'S LEASES**

86.    Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

87.    Woodside's Leases provide the binding obligation for royalty payment between Woodside and the government.

88.    Woodside's Leases contain the following provision for in-kind payment of royalty to the government:

> When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) *at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.*

(Emphasis added).

89.    In other words, when taking royalty in kind, the government must pay its share of transportation from the lease to the delivery point. By denying Woodside's Refund Request, the Decision and Order attempted to brush aside this provision and create a requirement that the government may take a free ride to the delivery point when taking royalty in value.

90.    Thus, the Decision and Order violated Woodside's Lease terms and must be reversed.

### COUNT X

### THE DEPARTMENT' REJECTION OF
### WOODSIDE'S ALLOCATION METHOD WAS ARBITRARY

91.    Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

92.    The Decision and Order claimed Woodside had failed to file a "proposal" to use a method to allocate costs between its oil and gas products within three months of first claiming its refund. Specifically, the Decision and Order claimed that the documentation submitted by Woodside was insufficient to be a "proposal." This was arbitrary because ONRR had not provided notice about what constituted a proper "proposal" as required under 5 U.S.C. § 552.

16

93.     The Decision and Order are further arbitrary because they falsely asserted that "regulations and associated regulatory history reflect a clear preference for lessees to allocate transportation costs on the basis of volume." In reality, the regulations on transporting gas and liquids together are silent on a "preferred" allocation method, and the regulations on transporting gases state an initial preference for volume but give the lessee the discretion to propose a method of allocation. Moreover, the gas regulations require ONRR to adopt the proposed method unless it finds the allocation inconsistent with the purposes of the regulation. 30 C.F.R. § 1206.157(b)(3)(ii) (gas) (ONRR "shall approve" the allocation for gas "unless it determines that it is not consistent with the purposes of the regulations in this part").

94.     Thus, the Decision and Order are arbitrary and must be vacated.

## COUNT XI

### THE DEPARTMENT HAS ARBITRARILY ADDED RESTRICTIONS TO THE REGULATIONS WITHOUT REQUIRED RULEMAKING

95.     Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

96.     The Department has, through the guise of "interpretation," added a substantive requirement that arbitrarily restricts a payor's depreciation schedules.

97.     The Department unlawfully adopted the substantive requirement without following notice and comment rulemaking under 5 U.S.C. § 553. It has failed to follow a procedure required by law. 5 U.S.C.§ 706(2)(D).

## COUNT XII

### THE DEPARTMENT'S FINDING THAT WOODSIDE OVERSTATED CAPITAL COSTS IS ARBITRARY

98.     Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

99.    The Decision and Order alleged that Woodside overstated certain capital costs. But Woodside provided the Department with information demonstrating that Woodside did not overstate its capital costs.

100.    Thus, the Decision and Order are arbitrary because their findings were not based on substantial evidence in the record. *Jung Park*, IBLA 2012-65, 2012 WL 1184347, at *5 (Mar. 13, 2012) ("[A]n agency decision . . . must be supported by a proper administrative record, including a reasoned analysis of the facts leading to the decision, which provides a rational connection between the facts found and the choices made . . . ."); *John L. Stenger*, 175 IBLA 266, 279–80 (2008).

## COUNT XIII

### THE DEPARTMENT'S DISALLOWANCE
### OF WOODSIDE'S "TOPSIDE" COSTS IS ARBITRARY

101.    Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

102.    The Decision and Order disallowed Woodside's "topside" costs because Woodside did not estimate allowable topside costs based on various arbitrary factors.

103.    However, Woodside demonstrated that its platform equipment costs correlate to design and build costs and are integral to the transportation system.

104.    Thus, the Decision and Order are arbitrary because they disallowed Woodside's topside costs despite substantial evidence demonstrating those costs were permissible deductions.

## COUNT XIV

### THE DEPARTMENT'S FINDING THAT WOODSIDE FAILED
### TO SUPPORT TRANSPORTATION ALLOWANCES IS ARBITRARY

105.    Woodside repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

106.    The Decision and Order contended that Woodside "did not provide the information necessary to support [its] determination of allowable capital costs and operating expenses." Specifically, the Decision and Order faulted Woodside for not providing "a detailed list of capitalized assets," for not showing and explaining "how certain equipment is allowed," for not supplying "the equipment list breakdown," and for not showing that the equipment was "otherwise more costly, and integral to the transportation system."

107.    But Woodside did provide a detailed list of capitalized assets to ONRR on October 14, 2020. Moreover, the requirement that the equipment be "otherwise more costly" is not the test under the Department's precedents.

108.    Thus, the Decision and Order are arbitrary because they concluded, contrary to the evidence, that Woodside failed to provide records to support its transportation allowances and because they imposed a novel requirement out of whole cloth.

### PRAYER FOR RELIEF

WHEREFORE, Woodside prays the Court:

1) Vacate the Decision and Order;

2) Hold the Decision and Order unlawful as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional right, power, or privilege; excessive of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; and unsupported by substantial evidence;

3) Enter declaratory judgment that the Decision and Order were unlawful, that the Department unlawfully disregarded regulations and Department precedent as to the oil and gas production at issue, and that such production must be permitted transportation allowances for costs incurred;

4)  Enter declaratory judgment, and to the extent warranted, compel agency action unlawfully withheld and unreasonably delayed, that Woodside is awarded and to be refunded all principal amounts requested, including interest amounts, to the extent permitted by law;

5)  Enter declaratory judgment that Woodside may retain allowances previously calculated;

6)  Award Woodside costs and attorneys' fees to the extent permitted by law; and

7)  Grant such other relief as may be appropriate in the circumstances.

Dated: January 17, 2025.

Respectfully submitted,

By: */s/ Ashlee Cassman Grant*
Ashlee Cassman Grant
LA Bar No. 33052
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 646-1364
Fax: (713) 751-1717
agrant@bakerlaw.com

***Attorney for Plaintiff Woodside Energy (Americas) Inc. f/k/a BHP Billiton Petroleum (Americas) Inc.***